IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CHARLES BURNESON, | ) CASE NO. 1:04CV2523 |
| Plaintiff, | ) JUDGE WELLS |
| v. | ) MAGISTRATE JUDGE HEMANN |
| THISTLEDOWN, INC., et al., | ) |
| Defendants. | ) **MEMORANDUM OPINION** <br> ) Docket ##26, 27 |

This case is before the magistrate judge on consent. Pending is the motion of defendant Thistledown, Inc. ("Thistledown") for summary judgment ("Def. 1 mot."; Docket #26). Also before the court is the motion of defendant the International Brotherhood of Teamsters, Local 436 ("the union") for summary judgment ("Def. 2 mot."; Docket #27). Plaintiff, Charles Burneson ("Burneson"), opposes both motions ("Pl. opp."; Docket #30). For the reasons stated below the court grants both defendants' motions.

I. Background

The court views the facts, as it must, in the light most favorable to the party opposing the motions. Burneson alleges or does not deny the following facts.

Thistledown owns and operates a horseracing track. Burneson began working for Thistledown as an outrider in August 2003. Outriders are responsible for leading horses

from the stables to the gates and for securing on the track any horses that have lost their riders. Outriders are licensed by the Ohio State Racing Commission.

The Collective Bargaining Agreement ("CBA"), Def. 1 mot., Exh. 2, entered into between Thistledown and the union governed Burneson's employment at Thistledown. Article VIII of the CBA specifies procedures for filing grievances:

> 8.01    No employee will be discharged without being given a hearing with the General Manager of the Employer at which hearing that steward and the Business Representative may be present. If a satisfactory resolution cannot be achieved at such hearing, the Grievance Procedure will pertain.
>
> 8.02    In the operation of the grievance procedure, the General Manager shall be the spokesman for the Employer unless he elects to call on other representatives.
>
> 8.03    A grievance shall be any complaint, controversy, dispute or other grievance (hereinafter referred to as "Grievance") arising between the Employer and the Union or any employee or employees concerning the questions of interpretation or application of the terms, conditions, and provisions of this Agreement and shall be settled through the following procedures:
>
> Step 1.    If an employee has a grievance, he shall first attempt to settle it with his Employer by presenting his grievance orally within 5 work days of the event giving rise to the grievance. If the matter is not resolved, then
>
> Step 2.    The grievant shall then immediately put the grievance in writing, date it and submit it to his union steward who shall meet with the Employer. The Employer will submit his written decision to the Union within five (5) work days from his meeting with the union steward. If the Employer's decision in Step 2 does not resolve the grievance, then
>
> Step 3.    The Union steward may refer the grievance to the business representative of the Union and to the Employer. The Employer and the Union shall meet and the Employer shall submit his written decision in Step 3 to the Union within five (5) work days from the date of the meeting between the Union and the Employer in Step 3. . . .
>
> If the grievance cannot be settled as outlined in STEP THREE within five (5) days after the first meeting of Employer and the Business Representative of the Union, the grievance may be submitted to arbitration as hereinbelow set out.

ARBITRATION

8.04 Either party may appeal the issues to arbitration in the following manner:

(a) By giving written notice to the other party of its demand to arbitrate, which notice shall contain a statement setting forth the nature of the dispute and the remedy sought and,

(b) By filing at the Cleveland Regional Office of the American Arbitration Association three copies of said notice together with a copy of the collective bargaining agreement, or such parts thereof as relate to the dispute, and including the arbitration provisions.

8.05 If the grievance is appealed to arbitration, the parties shall select an arbitrator within ten (10) calendar days after the filing of the demand for arbitration, and if they are unable to select the arbitrator, one shall be appointed upon written request by either party through the auspices and under the procedures of the American Arbitration Association.

8.06 When the arbitrator has been selected, the arbitrator shall preceed [sic] under the rules of the American Arbitration Association. . . .

8.07 The arbitrator shall be guided by this Agreement, in reaching his decision . . . .

8.08 The decision of the arbitrator shall be final and binding upon both parties and upon all affected employees.

8.09 The grievance procedure and the arbitration provision of the Agreement are the sole method unless otherwise provided available to the parties for the settling of any complaints, disputes, differences, or controversies arising between them or between any employee and Employer; it is understood that Employees, Employers, and the Union covered by the Agreement shall be bound by this Agreement shall [sic] be bound by any decisions, determinations, agreements or settlements which may be effectuated pursuant to the invocation of the grievance procedure or arbitration.

Agreement at ¶¶ 8.01-8.09 (punctuation in the original).

Employment at Thistledown is also governed by the Thistledown Workplace Violence Policy ("Violence Policy"). Notice of Filing of Amended Exhibit 3 in Support of Defendants' Motion for Summary Judgment (Docket #29). The Violence Policy provides

3

in relevant part:

> Thistledown maintains a policy of **Zero Tolerance** toward all forms of workplace violence. . . . Workplace violence is defined at Thistledown to be:
>
> - Any act of direct violence perpetrated by a person or persons against another person or animal;
> - Any act of verbal degradation by a person against another person;
> - Any act designed to threaten or menace someone either verbally or by implication, or by the use of pantomime or gesture, committed by a person or persons against others; and
> - Any act or verbal comment, even in jest, that suggests a threat to people or animals.
>
> For the purposes of this policy, the workplace is defined as the entire Thistledown property including the stable area, and all personnel employed in the stable area. This includes, but is not limited to, Thistledown employees; horse owners; grooms and all others who are employed by horse owners; self-employed people such as trainers, jockeys; and all others.
>
> Acts of violence and of menacing are prohibited by the Management of Thistledown, and are also prohibited by Ohio State Law and by the Ohio State Racing Commission rules. Employees who violate this policy will be terminated.

Violence Policy at 1 (emphasis in the original).

Burneson's employment file at Thistledown prior to his termination includes a series of disciplinary actions taken against him. On May 4, 1989 Burneson was suspended for 10 days, fined $50, and placed on probation for the rest of the season for being the aggressor in a disturbance in the barn area. Association of Racing Commissioners License Summary, Pl. 1 mot., Exh. 4, p. 2. A series of complaints about Burneson led to his being denied stable privileges at Thistledown on November 22, 1991. *Id.* Burneson was again suspended on October 8, 1992 and put on probation for the remainder of the season for striking another license holder. *Id.* On April 15, 1996 he was fined $100 and put on probation for the remainder of the season. *Id.* In December 1999 a pony person filed a complaint against Burneson alleging that he had broken her finger. *Id.*; Thistledown

4

Incident Report, Pl. 1 mot., Exh. 4.  In July 2000 his license was rescinded at his own request because a domestic violence conviction made him ineligible to hold a license. *Id.* On September 5, 2001 Burneson's license was suspended for 60 days, and he was fined $1,000 for being in possession of syringes, hypodermic needles, and injectable substances in violation of Ohio State Racing Commission Rules. *Burneson v. Ohio Racing Comm'n*, 2004 WL 1405321 (Ohio App. June 24, 2004).  On May 26, 2004 Thistledown warned Burneson that due to complaints alleging that he had abused and harassed pony personnel, disciplinary action would be taken against him if there were any further instances of misconduct.  Declaration of William Couch ("Couch"), Pl. 1 mot., Exh. 9, p. 2.

Thistledown contends that on June 19, 2004 Burneson signed a Employee Receipt of Handbook Acknowledgment–Union which included in relevant part the following two paragraphs:

> I hereby acknowledge that I received the employee handbook describing the policies, procedures, benefits and regulations of Thistledown. I have read and understand the policies, procedures, benefits and regulations contained in the handbook, and I am aware of my obligations to fully comply at all times with the responsibilities that are required of me as a condition of employment.
>
> ***I also understand that this handbook is not an employment contract, either express or implied, and that my employment is "at will," meaning that my employment may be terminated by the track at any time with or without cause subject to the provisions of the union Collective Bargaining Agreement.***

Exh. 3.  Burneson contends that the signature on this document was forged.

In early July 2004, two horses that should have been shipped to Canter, an organization that finds homes for retired racehorses, disappeared. There were suspicions that the horses had been diverted to the Andio slaughterhouse, and Thistledown began an investigation.

5

On July 9, 2004 Noell Silverton ("Silverton"), a representative of Canter, was talking to Nancy Zagin, Blair Mullen ("Mullen"), and Becky Sackett near the Thistledown kitchen. According to Silverton and Mullen, the following events occurred at that time. See Statements of Silverton and Mullen, Pl. 1. mot., Exh. 5. Burneson approached closely to Silverton, pointed his finger at her face, and said, "You're saying things that I haven't done. I haven't touched those horses. I didn't trailer those horses. You called Andio." Silverton put up her left hand and said, "Get away from me. Leave me alone or I'll call the police." She denied having called Andio, got out her telephone, and repeated, "Leave me alone." Silverton regarded Burneson's actions and tone of voice as threatening. The three persons to whom Silverton had been speaking stepped toward Burneson, and Silverton retreated into the kitchen. Burneson started to follow her, then he left.

Silverton reported the incident to the stewards and complained to Couch, the Director of Racing at Thistledown. After reviewing the complaint and the written statements of Silverton and Mullen, Couch met with Burneson later on July 9, 2004. Also present at the meeting were Stall Superintendent Doug Dubie and three stewards: Joel McCullart, Allen Fairbanks, and Kim Sawyer. After Burneson was told of Silverton's complaint, he was given an opportunity to give his version of the incident. Burneson denied misconduct and called Silverton a liar. Couch found Burneson's explanation to be unsatisfactory in light of the written statements of Silverton and Mullen. He informed Burneson that he was suspended for a week pending an investigation.

On July 16, 2004 Camille A. Favre ("Favre") sent Burneson a letter. Letter of Favre to Burneson, July 16, 2004, Pl. 1 mot., Exh. 6. In her letter Favre explained that he had been suspended pending an investigation of his apparent violation of Thistledown's zero

6

tolerance policy. She stated that the investigation had been completed and that, based on its findings, Burneson was terminated as of July 9, 2004. She also informed him that Union Business Agent John Banno ("Banno") had been told of the termination. Favre explained that Burneson could claim any personal property left at the track by contacting John Durastanti, Director of Facilities.

Burneson did not present a grievance orally to Thistledown within five days of being suspended or within five days of his being terminated. At some time between his suspension and his termination Burneson left a telephone message with Banno.[1] Immediately after being informed of his termination, Burneson left another telephone message for Banno.[2] Burneson left a third message for Banno a day or two after his second telephone call, asking what he had to do to file a grievance. Banno called Burneson the next day. Burneson offered the following testimony regarding his conversation with Banno:

> Q. . . . [T]o the best of your recollection, what did Mr. Banno tell you?
> A. From what I can remember the conversation was I was already terminated, there wasn't a whole lot I could do.
> Q. Okay. Now, it is correct you didn't ask Mr. Banno for a grievance form when you spoke with him on the phone, correct?
> A. I asked him what procedures I had to do. He says at that time I was already terminated. I didn't go through the proper steps.
> Q. . . . It is correct you didn't ask Mr. Banno for a grievance form when you spoke with him, correct?
> A. Yes.
> Q. It's also correct that after speaking with Mr. Banno you didn't go down to the union hall and ask for a grievance form, correct?

---

[1] There is no evidence in the record regarding the content of that message. See Burneson depo. at 10, 15-16.

[2] Burneson is unable to remember the content of that message. See Burneson depo. at 16.

7

      A.    No, I didn't go.
      Q.    It's also correct that after speaking with Mr. Banno you didn't contact any of the other officers of the local to discuss your termination at Thistledown, correct?
      A.    Well, like I said, he told me there wasn't a whole lot that I could do, so I just kind of, I didn't know what to do at that point in time.
      Q.    So that being it's correct you didn't discuss the grievance issue and your termination with any of the other business agents or officers at Local 436, correct.
      A.    I – yeah.

          \*      \*      \*      \*      \*

      Q.    . . . It's correct you didn't ask Mr. Banno to file a grievance?
      A.    Yes. I asked him what I had to do to file a grievance.
      Q.    And did he refuse to give you a grievance form?
      A.    He said there was nothing I could do at that time. I guess that's refusing, from what I understand, you know, from the conversation.

          \*      \*      \*      \*      \*

      Q.    Do you recall Mr. Banno informing you that you hadn't filed a grievance within the time limits of the contract?
      A.    He told me that after I was terminated. That's why he said there wasn't much I could do. I wasn't aware of the procedure. That's why I was trying to talk to Mr. Banno.

Deposition of Burneson, Pl. 1 mot., Exh. 1, pp. 17-18, 19, 20. Burneson understood Banno's comment that there was not much that could be done to mean that there wasn't much that he could rely on to get his job back or that the union could not prevail if he filed a grievance. *Id.* at 35, 37, 46-47. Burneson also stated that to the best of his memory he did not ask any other member of the union or the Teamsters to help him file a grievance, to give him information about what he could do to grieve his termination, or to send him a grievance form. *Id.* at 21-26.

Burneson testified that he did not know of the grievance procedures established by the CBA until a copy of the CBA was sent to him at his request about 10-12 days after his

telephone conversation with Banno. *Id.* at 27-28. After Burneson received a copy of the CBA and read it, he took no further action to file a grievance regarding his termination. *Id.* at 30-32.

## II. Summary judgment standard

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U. S. 317 (1986). The moving party must demonstrate to the court the absence of a genuine issue of material fact through reference to pleadings and discovery responses. *Id.* at 323. The nonmoving party must then demonstrate that a material issue of fact exists for trial. *Id.* at 324.

When a court evaluates a motion for summary judgment, "the inferences [that the court draws] from the underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion . . . ." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962); *Aetna Ins. Co. v. Loveland Gas & Elec. Co.*, 369 F.2d 648 (6th Cir. 1966). This means that the court must regard the nonmoving party's uncontradicted allegations as true and give the benefit of the doubt to the nonmoving party's assertions when they conflict with the movant's assertions. *Bishop v. Wood*, 426 U.S. 341 (1976); *Bosely v. City of Euclid*, 496 F.2d 193, 197 (6th Cir. 1974).

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See*

*Celotex,* 477 U.S. at 324. The nonmoving party must oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ." *Id.* A scintilla of evidence in favor of the nonmoving party is not sufficient. There must be enough evidence that a reasonable jury could find for the nonmoving party. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989).

### III. Analysis

Thistledown and the union move for summary judgment on Burneson's § 301 claim, contending that Burneson has failed to exhaust his administrative remedies and is unable to show a breach of the duty of fair representation on the part of the union or a breach of the CBA. Burneson contests both motions.

Usually, a claim that an employer has breached a collective bargaining agreement is enforced by the union on behalf of its members. This presumes that the union will fairly and impartially represent its members. Thus, "[j]ust as . . . fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 75 (1991).

If an employee believes that he has been discharged in violation of the collective bargaining agreement, and if the employee also believes that the union has failed fairly and impartially to enforce the collective bargaining agreement on the employee's behalf, the employee may file suit against both the employer for breach of the collective bargaining agreement and against the union for breach of its duty of fair representation. Such a suit is brought pursuant to § 301(a) of the Labor Management Relations Act, 29 U.S.C. §

185(a), and is known as a "hybrid § 301" action. "[T]o recover against *either* the Company or the Union, [plaintiff] must show that the Company breached the Agreement *and* that the Union breached its duty of fair representation. Unless [plaintiff] demonstrates *both* violations, he cannot succeed against either party." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) (quoting *Bagsby v. Lewis Bros. Inc. of Tennessee*, 820 F.2d 799 (6th Cir. 1987)) (alterations of the original by the quoting court) (citations omitted).

Generally, an employee must exhaust all administrative remedies before bringing a hybrid § 301 action:

> "[F]ederal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress." *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). An employee must give the union an opportunity to pursue his claim unless the contract states otherwise. *Id.* at 653.
>
> When an agreement includes grievance or arbitration procedures that are intended to be the exclusive remedy for employee complaints, an employee must at least attempt to exhaust all grievance and arbitration procedures provided for in the agreement before filing suit. *Vaca v. Sipes*, 386 U.S. 171, 184 (1967); *see also Clayton v. International Union, United Auto., Aerospace and Agric. Implement Workers*, 451 U.S. 679, 681, 101 S.Ct. 2088, 2090, 68 L.Ed.2d 538 (1981) ("An employee seeking a remedy for an alleged breach of the collective-bargaining agreement . . . must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement before he may maintain a suit against his union or employer under § 301(a) of the Labor Management Relations Act."); *Poole v. Budd Co.*, 706 F.2d 181, 183 (6th Cir. 1983) ("It is axiomatic that an aggrieved employee must exhaust any exclusive grievance and arbitration procedure created in a collective bargaining agreement prior to bringing a § 301(a) suit against the employer."). However, because the nature of these grievance procedures is such that they are controlled by the employer and the union, there are circumstances in which the employee is not held to this exhaustion requirement. *Id.* at 185. These circumstances include the following: when the employer's conduct operates as a repudiation of the procedures set out in the contract; when the union has breached its duty of fair representation in its treatment of the grievance; and when utilization of the grievance process would be futile. *Vaca*, 386 U.S. at 185-86; *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 330 (1969). *See also Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976); *Clayton*, 451 U.S.

11

at 684 ("[S]ome courts hold that the employee's failure to exhaust is excused if union officials would be so hostile to an employee that he could not hope for a fair hearing.").

The failure to exhaust remedies provided by the collective bargaining agreement is fatal to a hybrid claim under § 301 unless the employee's failure to exhaust falls within one of the exceptions listed above. *Winston v. General Drivers, Warehousemen & Helpers, Local Union 89*, 93 F.3d 251, 255 (6th Cir. 1996). As this Court noted in *Panter v. American Synthetic Rubber Corp.*, 708 F. Supp. 809, 810-11 (W.D. Ky.1987), *aff'd* 845 F.2d 327 (6th Cir.), *cert. denied*, 488 U.S. 827 (1988), when a claim "is based upon a breach of the collective bargaining agreement [a plaintiff] is bound by the terms of that agreement as it governs the manner in which contractual rights may be enforced."

*Humphress v. United Parcel Serv., Inc.*, 31 F. Supp. 2d 1004, 1010 (W.D. Ky. 1997).

In the instant case Burneson failed to exhaust the administrative remedies provided by the CBA. Burneson argues that the court should excuse his failure to exhaust his remedies because (1) he was ignorant of the procedures for filing a grievance because the union never provided him with a copy of the CBA, (2) the union breached its duty of fair representation by failing timely to respond to his inquiries regarding how to file a grievance, (3) the union failed to provide a copy of the union's constitution, and (4) the section of the union's constitution concerning exhaustion of internal union remedies is difficult to find and to understand. None of these arguments suffices to excuse Burneson's default.

Ignorance of one's obligations does not excuse one from their strictures. As noted above, the Supreme Court permits three exceptions to the rule that an employee must exhaust the administrative remedies provided by a collective bargaining agreement. Ignorance of those remedies is not one of the exceptions. Burneson had worked for Thistledown for nearly a year when the incident with Silverton occurred.[3] That Burneson

---

[3] Furthermore, he had worked at Thistledown on and off several times in previous years.

12

managed during that year to remain ignorant of the terms of the CBA that governed his employment at Thistledown does not privilege him to ignore the terms of that agreement. Nor may Burneson complain that the union did not timely send him a copy of the CBA when Burneson did not ask for a copy of the CBA until after the deadline for filing a grievance had passed. Burneson cannot be released from his obligations merely because he never tried in a timely manner to learn what those obligations were.

Burneson also argues that the union breached its duty of fair representation by failing timely to respond to his inquiries regarding how to file a grievance. This argument, too, is not well taken. Burneson asserts that he tried three times to contact Banno at the union regarding the Silverton incident: once before his termination, once immediately after his termination, and once a day or two after his second attempt. Burneson offers no evidence regarding the subject matter of the first two messages he left for Banno or that he expressed any urgency about Banno's returning his call. According to the evidence in the record, the first time Burneson asked about procedures for filing a grievance was in the third message he left for Banno. Moreover, Burneson testified that Banno called him the day after he left that third message. This cannot be called a dilatory response, and Burneson's argument that the union breached its fiduciary duty must be dismissed for this reason alone.

In addition, Burneson cannot argue that the union breached its fiduciary duty because the record indicates that by the time Burneson talked to Banno the deadline for filing a grievance had already passed. Burneson's testimony regarding his telephone conversation with Banno includes the following:

> Q. Do you recall Mr. Banno informing you that you hadn't filed a grievance

13

>   within the time limits of the contract?
>   A.   He told me that after I was terminated. That's why he said there wasn't much I could do. I wasn't aware of the procedure. That's why I was trying to talk to Mr. Banno.

Burneson depo. at 20. Burneson has testified, therefore, that when he talked to Banno, Banno told him that it was already past time for filing a grievance. That is consistent with Banno's telling Burneson that "there wasn't a whole lot [he] could do" and that he "didn't go through the proper steps." *Id.* at 17. Thus, by the time Burneson talked to Banno, Burneson had already defaulted on his opportunity to file a grievance regarding his termination. Burneson cannot blame the union for his own failure to act in a timely manner.

Burneson also argues that his failure to exhaust administrative remedies should be excused because the union failed to provide a copy of the union's constitution and the section of the union's constitution concerning exhaustion of internal union remedies is difficult to find and to understand. These arguments are beside the point. Neither is an acceptable reason for failing to exhaust remedies under the CBA both because the Supreme Court does not permit them as exceptions to the rule of exhaustion and because they are relevant only to internal union procedures, not to procedures for filing a grievance with Thistledown.

In sum, Burneson's arguments that his failure to exhaust administrative remedies pursuant to the CBA are not well taken. Burneson's failure to exhaust remedies provided by the CBA is fatal to his hybrid § 301 action, and this cause of action must be dismissed as to both parties.

## IV. Conclusion

For the reasons given above the court grants defendants' motions for summary

judgment and dismisses Burneson's causes of action with prejudice.


Date: May 30, 2006                         /s/Patricia A. Hemann
                                           Patricia A. Hemann
                                           United States Magistrate Judge